# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BOSTON EXECUTIVE SEARCH
ASSOCIATES, INC.,

                    Plaintiff,

v.

FRESHFIELDS BRUCKHAUS DERINGER
US LLP,

                    Defendant.

Civil Action No. 1:19-cv-12378-RGS

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FRESHFIELDS BRUCKHAUS DERINGER US LLP'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Joseph F. Savage, Jr. (BBO # 443030)
Courtney D. Orazio (BBO # 692385)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
T:  617.570.1000
F:  617.523.1231
JSavage@goodwinlaw.com
COrazio@goodwinlaw.com

Timothy P. Harkness (*pro hac vice*)
Brayden Koslowsky (*pro hac vice forthcoming*)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue
New York, New York 10022
T: 212.230.4610
timothy.harkness@freshfields.com
brayden.koslowsky@freshfields.com

*Counsel for Defendant Freshfields Bruckhaus Deringer US LLP*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................3

LEGAL STANDARD....................................................................................................................7

ARGUMENT .................................................................................................................................7

**I.**     THE COURT NEED NOT DECIDE CHOICE OF LAW TO DISMISS THE SAC .........7

**II.**    ESA'S CLAIMS MUST BE DISMISSED UNDER MASSACHUSETTS LAW .............8

**III.**   ESA'S CLAIMS MUST BE DISMISSED UNDER NEW YORK LAW........................15

CONCLUSION.............................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur D. Little, Inc. v. Dooyang Corp.*,
    147 F.3d 47 (1st Cir. 1998).........................................................................13, 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................7, 14

*Atkinson v. Rosenthal*,
    33 Mass. App. Ct. 219 (1992)..........................................................................13

*BNY Fin. Corp. v. Fitwel Dress Co., Inc.*,
    6 Mass. ...................................................................................................20

*Bradley v. Dean Witter Realty, Inc.*,
    967 F. Supp. 19 (D. Mass. 1997)......................................................................20

*Cantell v. Hill Holliday Connors Cosmopulos, Inc.*,
    55 Mass. App. Ct. 550 (2002)..........................................................9, 10, 11, 12

*Childers v. N.Y. & Presbyterian Hosp.*,
    36 F. Supp. 3d 292 (S.D.N.Y. 2014)..................................................................15

*Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*,
    228 F.3d 24 (1st Cir. 2000)...............................................................................7

*Cohen v. Avanade, Inc.*,
    874 F. Supp. 2d 315 (S.D.N.Y. 2012)...........................................................15, 17

*Cornwell Entm't, Inc. v. Anchin, Block & Anchin LLP*,
    2013 WL 2367849 (D. Mass. 2013) ..................................................................20

*Corp. Dev. Assocs. v. Staples, Inc.*,
    2013 WL 597488 (Mass. Super. 2013).................................................................12

*Costa v. Mass. P'ship for Corr. Healthcare*,
    2018 WL 3769823 (D. Mass. 2018) ..................................................................20

*Dragon Inv. Co. II v. Shanahan*,
    854 N.Y.S.2d 115 (2008)............................................................................18, 19

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    2014 WL 304070 (D. Mass. 2014) ................................................................14, 15

*Fink v. Time Warner Cable*,
810 F. Supp. 2d 633 (S.D.N.Y. 2011)...................................................................15

*FranCounsel Grp., LLC v. Dessange Int'l SA*,
980 F. Supp. 2d 1 (D. Mass. 2013) ...........................................................8, 11, 12

*GMO ex rel. GMO Emerging Country Debt Fund v. ICAP*,
2012 WL 5197545 (D. Mass. 2012) ......................................................................13

*Greenwood Tr. Co. v. Mass.*,
971 F.2d 818 (1st Cir. 1992)....................................................................................8

*HSBC Realty Credit Corp. v. O'Neill*,
745 F.3d 564 (1st Cir. 2014)..................................................................................20

*Husk, LLC v. Coca-Cola Refreshments*,
2013 WL 55815 (D. Mass. 2013) ..........................................................................14

*Koch v. Multiplan, Inc.*,
2001 WL 210004 (S.D.N.Y. 2001) ........................................................................19

*Michael A. Mentuck & Assocs., v. Lloyds Underwriting Syndicate*,
2013 WL 783050 (D. Mass. Feb. 28, 2013) .................................................. *passim*

*Mid-Hudson Catskill Rural Migrant Ministry v. Fine Host Corp.*,
418 F.3d 168 (2d Cir. 2005).............................................................................17, 18

*Prince of Peace Enters., Inc. v. Top Quality Food Mkt.*,
760 F. Supp. 2d 384 (S.D.N.Y. 2011).........................................................15, 16, 17

*Royal Bus. Grp., v. Realist, Inc.*,
933 F.2d 1056 (1st Cir. 1991)..........................................................................1, 7, 8

*Schatz v. Republican State Leadership Comm.*,
669 F.3d 50 (1st Cir. 2012)................................................................................7, 16

*Spectrum Sales, Inc. v. Cobham Def. Elec. Sys.*,
2014 WL 1758109 (Mass. Super. 2014)................................................................12

*State Tax Auditing & Research v. Waters Corp.*,
2000 WL 782948 (Mass. Super. 2000)..............................................................9, 11

*Vioni v. Am. Cap. Strategies*,
508 F. App'x 1 (2d Cir. 2013) ....................................................................17, 18, 19

*Von Papen v. Rubman*,
18 F. Supp. 3d 77 (D. Mass. 2014) ......................................................................11

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993) .................................................................................................7

*Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd.*,
  2015 WL 4467064 (D. Mass. 2015) ............................................................... *passim*

*Zenon v. Guzman*,
  924 F.3d 611 (1st Cir. 2019) ............................................................................2, 9

## Statutes

M.G.L. c. 93A ...................................................................................................... *passim*

M.G.L. c. 259, § 7 ............................................................................................... *passim*

## Other Authorities

Fed. R. Civ. P. 12(b)(6) ....................................................................................... *passim*

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Freshfields Bruckhaus Deringer US LLP ("Freshfields") submits this Memorandum in support of its Motion to Dismiss, with prejudice, the Second Amended Complaint ("SAC") filed by Boston Executive Search Associates, Inc. ("ESA").

## PRELIMINARY STATEMENT

By way of five equally baseless claims,[1] legal recruiting firm ESA demands a multi-million dollar pay-day, based on an "agreement" with Freshfields that did not exist, for a purported lateral partner "introduction" that it never made.  In ESA's first attempt to bring this lawsuit, it alleged activity primarily in Massachusetts.  Freshfields moved to dismiss each claim as plainly insufficient under Massachusetts law, so ESA amended its Complaint by eradicating most references to Massachusetts and sprinkling in nine references to New York in an attempt to change or manufacture an issue as to the governing law.  But ESA's alternative pleading tactic does nothing to salvage its claims.  Instead, the SAC only further highlights that—regardless of which state's law applies—Freshfields never agreed, in any form, to any term of any payment to ESA for any so-called "services," nor did ESA provide any "services" entitling it to the fee it demands.  And, since the "results will not vary" whether Massachusetts or New York law governs—ESA's claims fail either way—this Court need not make a formal choice of law to dismiss the SAC.  *Royal Bus. Grp.*, *v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991).

ESA's claims all fail, first, under Massachusetts law.  Since ESA does not allege that it had a signed, written contract with Freshfields—nor could it, as no such thing existed—its claims are barred by the Business Broker Statute of Frauds.  That Statute precludes claims by recruiting firms such as ESA arising out of "any agreement to pay compensation for service as a broker or finder," "unless such agreement is ***in writing, signed by the party to be charged***."  M.G.L. c. 259, § 7.

---

[1] The SAC includes claims for: violation of M.G.L. c. 93A (Count 1), quantum meruit (Count 2), unjust enrichment (Count 3), breach of contract (Count 4), and breach of the implied covenant (Count 5).  (ECF No. 25, ¶¶ 67-104.)

ESA fails to meet this requirement.  Indeed, courts in this District routinely grant motions to dismiss where, as here, the Statute's application is "clear on the face of the [] pleadings." *Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019); *Michael A. Mentuck & Assocs.*, *v. Lloyds Underwriting Syndicate*, 2013 WL 783050, at *4-5 (D. Mass. Feb. 28, 2013) (granting motion to dismiss breach of contract, breach of implied covenant, quantum meruit, and 93A claims for "broker or finder" fees for lack of signed, written contract").  ESA's Chapter 93A claim—which amounts to a repackaged set of ESA's deficient contract allegations—fails, separately, because it fails to plead numerous required statutory elements, including: (i) any "unfair or deceptive conduct"; (ii) that occurred "substantially and primarily" in the Commonwealth.

The SAC fares no better under New York law.  ESA's contract claims fail because the SAC does not allege that the parties ever assented to any terms of any agreement (they did not).  ESA's quasi-contract claims fail, relatedly, because the SAC does not allege that Freshfields ever reasonably expected to pay ESA what it now demands (Freshfields did not).  Instead, ESA asks the Court to search for an agreement amongst every piece of paper that ESA can conceive of— including "ESA's fee agreement," "or, alternatively," Freshfields' fee agreement, or "various emails" or "a combination"—or to detect an unspecified "parol agreement."  (SAC ¶ 92.)  Yet these documents establish that the parties ***disagreed*** on every material term.  There was no meeting of the minds on anything here.  ESA's Chapter 93A claim, meanwhile, must be dismissed not only because the SAC fails to allege the requisite elements, but also as a *per se* matter of law.  To the extent that New York law governs ESA's contract claims (as ESA now urges), ESA cannot seek a Massachusetts statutory remedy for the same underlying conduct.

The SAC is also riddled with the sort of "misstatement and exaggeration" that led the Massachusetts Legislature to enact M.G.L. c. 259, § 7.  *Whitman & Co., Inc. v. Longview Partners*

2

*(Guernsey) Ltd.*, 2015 WL 4467064, at *7 (D. Mass. 2015). The crux of ESA's lawsuit is that it is owed a fee, pursuant to the parties' "agreement," for "introducing" Freshfields to lateral partner candidate Ethan Klingsberg. In reality, Freshfields rejected ESA's proposed fee agreement for its purported "services," made a counteroffer with materially different terms that ESA never accepted or complied with, and never otherwise agreed to any terms of any payment to ESA to do anything. Nor did ESA make any "introduction." Freshfields itself identified this candidate—a Freshfields partner's law school classmate—and a different recruiter—one that Freshfields ***had*** engaged— introduced him. In marked contrast, the sum total of ESA's involvement was a single cold call to Mr. Klingsberg, made without Freshfields's instruction, months after his recruitment had begun (with the assistance of the other recruiter, who was compensated by Freshfields), nearly a full year before his hiring. ESA made no further recruiting efforts, much less make the alleged "introduction" on which this lawsuit is based.

Ultimately, however, even accepting every fact in the SAC as true, ESA does not state any claim under the law of Massachusetts ***or*** New York. The SAC should be dismissed, with prejudice.

## **BACKGROUND**

### A.    **Freshfields's Interactions With ESA**

Headquartered in the United Kingdom, Freshfields is a 275 year-old global law firm that has steadily built its presence in the United States. In 2018, Freshfields sought to expand its U.S.-based mergers and acquisitions practice. To that end, Freshfields met with legal recruiting firms to discuss its search for lateral partner candidates, ultimately engaging, and executing a written contract with, a New York-based recruiting firm in early 2018. Months later, in August 2018, legal recruiter ESA—which Freshfields had never previously engaged to do anything (SAC ¶¶ 1-104)—spoke with Freshfields about potentially assisting with its partner search. (*Id.* ¶ 26.) ESA does not allege that it was ever directed by Freshfields to contact any particular candidates.

3

On August 23, 2018, ESA's Phil Morimoto asked Freshfields partner Mitchell Presser to send a copy of Freshfields's "standard agreement," because ESA "d[id] not yet have a completed fee agreement with [] Freshfields." (SAC ¶ 33.)  Mr. Presser replied: "If we have a standard one, we will send it.  If not, we will work with yours." (Declaration of Joseph F. Savage ("Savage Decl."), Ex. A.)  At no time did Mr. Presser say that Freshfields "would agree" to ESA's contract, as ESA falsely claims (for the first time in the SAC) by mischaracterizing Mr. Presser's August 23 email.  (SAC ¶ 34 ("Presser stated that if [] Freshfields had a standard agreement he would send it to [Mr.] Morimoto, otherwise, Freshfields *would agree* to Plaintiff ESA's agreement.").)[2]  And ESA's remaining allegations make clear that the parties never reached any agreement, in any form, to anything.  As ESA admits—twice—it "has no present knowledge whether [] Freshfields executed" ESA's proposed fee agreement ("ESA's Offer"), which ESA first sent to Mr. Presser on September 19, 2018 (Freshfields did not).  (SAC ¶¶ 38, 58; Savage Decl., Ex. B.)  Instead, as ESA also admits, on November 26, 2018, Freshfields sent a written counterproposal to ESA, (*id*. ¶ 54), which ESA never accepted ("Freshfields's Counteroffer").  Freshfields's Counteroffer states expressly that Freshfields "shall not pay any placement fees" unless a recruiter meets certain conditions, which are materially different from, and conflict with, those in ESA's Offer:

- A recruiter must be the First Referral Agency, meaning nobody else had notified Freshfields of the candidate's availability (*compare* Savage Decl., Ex. C ¶ 2 (Freshfields's Counteroffer), *with* Ex. B (ESA's Offer, imposing no such requirement));

- The recruiter must submit to Freshfields an Authorization Notice attesting that the recruiter possesses "the candidate's written consent" "to present him or her," consistent with the National Association of Legal Search Consultants ("NALSC") Code of Ethics (*compare* Savage Decl., Ex. C ¶¶ 2, 6 (Freshfields's Counteroffer), *with* Ex. B (ESA's Offer, imposing no such requirement));

- Freshfields must "elect[] the Partner candidate within six months" of receiving the Authorization Notice (*compare* Savage Decl., Ex. C ¶¶ 3, 4 (Freshfields's Counteroffer), *with* Ex. B § 1.2 (ESA's Offer, providing for a one-year duration)).

---

[2] This contention is also ironic given ESA's new effort to invoke New York law: ESA's Offer includes a choice of law provision that mandates application of ***Massachusetts*** law.  (Savage Decl., Ex. B § 2.6.)

As the SAC itself establishes, ESA satisfied ***none*** of these conditions (so, if there was a contract, ESA never performed according to it).  And, even if ESA had met such conditions, Freshfields's Counteroffer makes clear that ESA would ***still*** not be entitled to the windfall it seeks, as Freshfields's Counteroffer expressly does not apply to "a group of attorneys," yet ESA demands a fee for just that.  (SAC ¶ 55; Savage Decl., Ex. C ¶¶ 1, 3.)[3]  As ESA admits, the parties never reached agreement on any of these terms.  To the contrary, the parties' battle of the forms culminated in ***disagreement***.  (SAC ¶ 56.)  On November 27, 2018, ESA's Justin Morimoto responded to Freshfields's Counteroffer by re-forwarding to Freshfields ESA's Offer, writing:

> Please see the email and attached fee agreement we sent to Mitchell Presser in September relating to our fee agreement . . . ***Please reach out to [our CEO] and [our COO], copied here, to discuss terms and conditions.  We note that the fee cap is significantly lower than expected*** given the types of candidates your firm wishes to recruit in New York, and lower than other caps we have in place for firms of similar stature to Freshfields.

(Savage Decl., Ex. B.)  On November 29, 2018, the SAC alleges, Freshfields replied by stating that it would take ESA's Offer to Freshfields's COO.  (SAC ¶ 57.)  Put simply: nowhere does ESA allege that the parties ever agreed, in ***any*** form—written or otherwise—to any term of payment to ESA for alleged recruiting services; even the amount of such payment, how it would be calculated, or the conditions under which it would be owed.  Indeed, the SAC explicitly alleges the opposite.

### B.    The Lateral Partner Hiring At Issue Here

Mr. Klingsberg, who attended law school with Mr. Presser, (SAC ¶ 45), had long been on Freshfields's radar as a lateral partner candidate.  In August 2018, Freshfields asked the New York-based recruiting firm it had engaged to pursue him.  That firm, accordingly, recruited him, secured his consent to make an introduction to Freshfields, made that introduction, facilitated the discussions that led to his hiring, and was paid its contractually-prescribed fee for doing so.

---

[3] Freshfields's Counteroffer also caps any fee at $600,000 per partner (Savage Decl., Ex. C ¶ 3), yet ESA demands a $2.25 million payment for the lateral partner hired here (plus millions more as to his three colleagues).  (SAC ¶ 81.)

On November 6, 2018, after Freshfields had already commenced its efforts to recruit Mr. Klingsberg, ESA decided—unbeknownst to Freshfields—that *it* would cold call him.  (SAC ¶ 40.) ESA did so even though Freshfields had not instructed it to, and even though Freshfields disagreed with and had not signed ESA's Offer sent roughly six weeks prior.  (*Id.* ¶¶ 1-104.)  During this call, ESA's Justin Morimoto allegedly asked Mr. Klingsberg if he would be "open to a further conversation regarding Freshfields."  (*Id.* ¶ 45.)  The SAC vaguely alleges that he "responded positively"; said that "he liked and respected" his law school classmate, Mr. Presser; and "suggested" to Mr. Morimoto that they "keep in touch."  *Id*.  This lone call is, notably, ESA's only alleged contact with Mr. Klingsberg.  (*Id.* ¶¶ 1-104.)  More notable still is ESA's failure to plead that he ever gave ESA his consent to make any introduction to anyone.  (*Id.* ¶ 45.)

The next morning, on November 7, 2018, ESA's Mr. Morimoto met Mr. Presser for breakfast in Cambridge, Massachusetts.  (SAC ¶ 47.)  There, Mr. Morimoto allegedly told Mr. Presser that he had a "positive" conversation with Mr. Klingsberg, who "likely would be willing" to "discuss the possibility of moving his practice" (although ESA does not allege that Mr. Klingsberg actually said these things).  (*Id.* ¶ 49.)  ESA claims it left this meeting "encouraged" by what it obscurely describes as "positive indications."  (*Id.* ¶ 51.)  But in reality, as ESA admits, just hours after this breakfast meeting, Mr. Presser emailed to ESA a four-word directive: "Hold off on Ethan."  (SAC ¶ 52.)  Thus, as the SAC alleges, ESA did nothing more concerning his candidacy: it had no further discussions, facilitated no meetings, conducted no negotiations, and made no introduction.  (*Id.* ¶¶ 1-104.)  Nearly a year later, on October 25, 2019, Freshfields announced that it had hired Mr. Klingsberg, along with three partners from his former firm.  (*Id.* ¶ 60.)  Now, ESA seeks to coerce a multi-million dollar fee for Mr. Klingsberg's "introduction," even though it spoke with him once (*id.* ¶ 45); even though Freshfields explicitly told ESA not to

perform any services as to Mr. Klingsberg (*id*. ¶ 52); and even though Freshfields told ESA it had been notified of his availability by a different recruiter, prior to ESA's lone cold call.  (*Id*. ¶ 65.)  ESA also seeks a fee, remarkably, for its so-called "services" in relation to his three colleagues (*id*. ¶ 81)—with whom ESA does not allege it ***ever*** communicated.

## LEGAL STANDARD

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  It is "well-established" that in deciding a 12(b)(6) motion, a court "may properly consider the relevant entirety" of a document "explicitly relied upon in the complaint . . . without converting the motion into one for summary judgment."  *Clorox Co. P.R. v. Proctor & Gamble Comm. Co*., 228 F.3d 24, 32 (1st Cir. 2000).  "Were the rule otherwise, a plaintiff could maintain a claim by excising an isolated statement from a document and importing it into the complaint."  *Id*.; *Watterson v. Page,* 987 F.2d 1, 3-4 (1st Cir. 1993) (documents "sufficiently referred to" in complaint properly considered on motion to dismiss).  Where "a conflict exists" between a complaint and documents it cites, those documents "trump the complaint's allegations."  *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 n.3 (1st Cir. 2012).

## ARGUMENT

## I.    THE COURT NEED NOT DECIDE CHOICE OF LAW TO DISMISS THE SAC

ESA's effort to manufacture a conflict of law does nothing to save its claims.  Courts may grant motions to dismiss under Rule 12(b)(6) without "mak[ing] a formal choice of law" where "it is unnecessary" because "the results will not vary" under either alternative.  *Royal Bus. Grp.*, 933 F.2d at 1064 (affirming dismissal).  That is the case here.  Since ESA's claims should be dismissed under Massachusetts ***and*** New York law, this Court need not "make a formal choice of law" to grant Freshfields's Motion.  *Id*.; *Greenwood Tr. Co. v. Mass.*, 971 F.2d 818 (1st Cir. 1992) (same).

7

## II.   ESA'S CLAIMS MUST BE DISMISSED UNDER MASSACHUSETTS LAW

### A.   ESA Is A "Broker" Or "Finder" Subject To The Statute Of Frauds

The Massachusetts Business Broker Statute of Frauds provides, in relevant part:

> Any agreement to pay compensation for service as a broker or finder . . . shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized . . . The provisions of this section shall apply to a contract implied in fact or in law.

M.G.L. c. 259, § 7. Enacted "to discourage claims for commission based on a conversation which persons heard [] or remembered differently," *Whitman*, 2015 WL 4467064, at *7, "Massachusetts courts construe the Statute of Frauds liberally to ensure its legislative purpose is served." *Mentuck*, 2013 WL 783050, at *3. Because M.G.L. c. 259, § 7 bars all claims for "broker or finder" fees based on "*any* agreement," including any "contract implied in fact or in law," courts in this District have repeatedly held that the failure to plead a signed, written agreement mandates 12(b)(6) dismissal "not only [of] contract claims but also any claims based on a contract implied in law, including recovery in quantum meruit" and "unjust enrichment." *Whitman*, 2015 WL 4467064, at *2, *7 (granting motion to dismiss quantum meruit and 93A claims by "broker or finder" for failure to satisfy M.G.L. c. 259, § 7).[4] The Statute "also bar[s]" 93A claims that are based on the same conduct—and thus, "derivative of"—contract-based claims for "broker or finder" fees. *Id.* at *7.

Anyone that fits the "ordinary meaning" of a "broker" or a "finder" is subject to M.G.L. c. 259, § 7: the terms "are not defined within the Statute" and are thus "given their ordinary meanings and construed according to their common usage." *Mentuck*, 2013 WL 783050, at *3. A "broker," to that end, is an "agent who acts as an intermediary or negotiator," *id.*, while a "finder" "locates,

---

[4] *FranCounsel Grp., LLC v. Dessange Int'l SA,* 980 F. Supp. 2d 1, 5 (D. Mass. 2013) (granting motion to dismiss quantum meruit claim by "broker or finder" for failure to satisfy M.G.L. c. 259, § 7, which "expressly precludes equitable relief"); *Mentuck*, 2013 WL 783050, at *4-7 (granting motion to dismiss breach of contract, breach of implied covenant, quantum meruit, and 93A claims by "broker or finder" for failure to satisfy M.G.L. c. 259, § 7).

introduces, and brings parties to a transaction together" to "make their own contract." *Cantell v. Hill Holliday Connors Cosmopulos, Inc*., 55 Mass. App. Ct. 550, 553 (2002).  Even one who "merely . . . identifies valuable information" for another is a "finder." *State Tax Aud. & Research v. Waters Corp.*, 2000 WL 782948, at *3 (Mass. Super. 2000).  Where a plaintiff seeks relief for "broker or finder" services, the Statute applies even if those terms are not "explicitly invoked" in the complaint. *Mentuck*, 2013 WL 783050, at *3.  And "an employment agency, more colloquially described as a 'recruiter' or 'headhunter,'"—like self-described "recruiter" ESA, (SAC ¶¶ 12, 17, 19, 22, 27)—explicitly qualifies as a "broker" ***and*** a "finder" for purposes of M.G.L. c. 259, § 7:

> [Plaintiff] is a "broker" because its claim [] is predicated upon [] serving as an intermediary… willing to negotiate an employment contract between [prospective employee] and [company]; [plaintiff] is a "finder" because it brought [them] together to form an employment agreement, and identified business opportunities for [company] by recommending prospective employees.

*Cantell*, 55 Mass. App. at 554 (dismissing breach of contract, quantum meruit, and 93A claims by "recruiter" or "headhunter" seeking fee for introducing prospective employee to employer as barred by M.G.L. c. 259, § 7 where plaintiff had "no written contract signed by the party to be charged"); *Mentuck*, 2013 WL 783050, at *4 (M.G.L. c. 259, § 7 "requires written commission agreements between prospective employers and companies acting as headhunters").

Here, it is "clear on the face of the [SAC]," *Zenon*, 924 F.3d at 616, that ESA is subject to the Statute of Frauds as a "broker" and a "finder."  Like the "recruiter" in *Cantell*, ESA describes itself, repeatedly, as a "***recruiter***" and a "***recruiting*** firm that specializes in lateral partner ***recruiting*** and placements."  (*Id*. ¶¶ 12, 17, 19, 22, 27.).  Also like the "recruiter" in *Cantell*, ESA is a "broker," for it "serve[s] as an intermediary" that "attempts to bring [] parties to an agreement." 55 Mass. App. at 554.  Indeed, parroting the caselaw (and dictionary) definition of a "broker" under M.G.L. c. 259, § 7, ESA alleges that recruiters like itself are "market ***intermediaries*** for law

firms" that aid in "hiring [] prospective lateral candidates."  (SAC ¶ 14-16.)[5]  ESA is also a

"finder": again, like the recruiter in *Cantell*, ESA "identifies, recruits, qualifies, [and] introduces"

partners to law firms, to "identif[y] business opportunities" and bring the parties "together to form

an [] agreement." 55 Mass. App. at 554.  (*Cf.* SAC ¶¶ 12, 14-18.)

      The SAC also confirms, unsurprisingly, that ESA's claims arise out of an alleged

"agreement to pay compensation" for its alleged services as a "broker or finder."  M.G.L. c. 259,

§ 7.  ESA alleges that Freshfields retained ESA to "***identify***[] and recruit[]" prospective partners,

(SAC ¶ 26); that Freshfields "agreed" to pay ESA "a fee" if ESA "***introduced***" Freshfields to a

partner candidate it later hired, (*id*. ¶¶ 94, 97); and that Freshfields deprived ESA of its fee for

"***introduc[ing]***" such a partner.  (*Id*. ¶ 95.)  Massachusetts law is well-settled: a plaintiff, like ESA,

that demands payment based on an alleged "agreement" to perform such "identification" or

"introduction" services—terms ESA uses more than 20 times to describe itself in the SAC[6]—is a

"broker or finder" subject to M.G.L. c. 259, § 7.  *Mentuck*, 2013 WL 783050, at *3 (granting

motion to dismiss contract, quasi-contract, and 93A claims seeking fee as "broker or finder" "for

***identifying***" a prospective buyer" of defendant's inventory); *Whitman*, 2015 WL 4467064, at *7

(granting motion to dismiss unjust enrichment and 93A claims by marketing agent seeking "finder"

fee for "***introducing*** prospective investors" to defendant's advisory services).[7]

    **B.**      **ESA's Claims Must All Be Dismissed For Failure To Satisfy The Business
Broker Statute of Frauds (M.G.L. c. 259, § 7)**

---

[5] *E.g.*, *Mentuck*, 2013 WL 783050, at *3 (a "broker" is an "agent who acts as an ***intermediary***"; a "finder" is an "***intermediary*** who brings together parties for a business opportunity"), *citing* Black's Law Dictionary 219 (9th ed.).

[6] *E.g.*, SAC ¶¶ 2, 7, 14, 16, 18, 23-24, 26-28, 31, 37, 39, 52, 55, 59, 64, 68, 69, 75-76, 78, 85, 94, 95, 97.

[7] *FranCounsel*, 980 F. Supp. at 5 (granting motion to dismiss quantum meruit claim by plaintiff who "acted as a broker or finder by ***introducing***" merging companies); *State Tax Auditing*, 2000 WL 782948, at *3 (dismissing breach of contract, unjust enrichment, and quantum meruit claims by "finder" seeking fee for "***identify[ing]*** valuable information" to aid company's tax preparation); *Cantell*, 55 Mass. App. at 554 (dismissing breach of contract, quantum meruit, and 93A claims by "recruiter" seeking fee for "***introducing***" company to "prospective employees").

Because the Statute of Frauds applies to ESA as a "broker or finder," the "only question remaining is whether [ESA's] claims, as they are pleaded, set forth plausible causes of action in light of the Statute's requirement[]" that there be an agreement "***in writing***, ***signed*** by the party to be charged therewith"—*i.e.*, Freshfields. *Mentuck*, 2013 WL 783050, at *3. Such writing must include "all essential terms . . . present together with the signature or mark of the party to be charged." *Von Papen v. Rubman*, 18 F. Supp. 3d 77, 85 (D. Mass. 2014). Allegations that "merely, and vaguely" allege "the existence of 'contracts and/or agreements,'" without "explicitly aver[ring] that a written, signed agreement existed," or "identify[ing] the date it was formed or the specific terms it contained," are "insufficient." *Mentuck*, 2013 WL 783050, at *5.

Here, there are no facts anywhere in the SAC's 104 paragraphs to suggest that the parties had ***any*** agreement "in writing" and "signed" by Freshfields (SAC ¶¶ 1-104), because no such thing existed. Indeed, ESA twice ***admits*** that it has "no present knowledge" of whether Freshfields executed ESA's Offer (Freshfields did not) (SAC ¶¶ 38, 58), nor does ESA allege that Freshfields ever agreed to or signed any ***other*** document (Freshfields did not). Far from alleging a signed, written agreement to "all essential terms," *Von Papen v. Rubman*, 18 F. Supp. 3d, 77, 85 (D. Mass. 2014), the SAC makes clear that the parties expressly ***disagreed*** on even the most basic of terms of any engagement—including the amount of any fee and the conditions under which it would be owed. (*See infra* at 16-17.) As in *Cantell*, ESA's groundless demand for a "one-time finder's fee"—based on an alleged "agreement" that never existed, for an alleged "introduction" ESA never made—falls squarely "in the heartland of the Statute's intended reach": to bar "cooked up claims of agreement" like ESA's here. *Spectrum Sales, Inc. v. Cobham Def. Elec. Sys.*, 2014 WL

1758109, at *3 (Mass. Super. 2014).[8]  M.G.L. c. 259, § 7 thus compels dismissal of ESA's claims

for their failure to allege any agreement "in writing, signed by the party to be charged":

- ***Contractual Claims (Counts 4, 5).*** ESA's failure to allege an agreement "in writing" and "signed" by Freshfields, as "the Statute of Frauds plainly requires…to be enforceable," dooms its claims for breach of contract and breach of the implied covenant, which can survive only where there is a "valid contract." *Mentuck*, 2013 WL 783050, at *4-7 (granting motion to dismiss); *Corp. Dev. Assocs.*, 2013 WL 597488, at *6 (dismissing breach of contract and implied covenant claims for "broker or finder" fee absent a signed, written contract); *Cantell*, 55 Mass. App. at 553 (same).

- ***Quasi-Contractual Claims (Counts 2, 3).*** In the absence of an agreement "in writing" and "signed" by Freshfields, M.G.L. c. 259, § 7 bars claims for "broker or finder" fees based on any "contract implied in fact or in law," such as quantum meruit and unjust enrichment. *FranCounsel*, 980 F. Supp. 2d at 6 (granting motion to dismiss quantum meruit claim for "broker or finder" fee absent a signed writing, as M.G.L. c. 259, § 7 "expressly precludes equitable relief"); *Whitman*, 2015 WL 4467064, at *5 (granting motion to dismiss unjust enrichment claim for "broker or finder" fee absent a signed writing); *Cantell*, 55 Mass. App. at 553 (dismissing quantum meruit claim).

- ***Chapter 93A Claim (Count 1)***. Because the "gravamen" of ESA's 93A claim is that Freshfields has "refused to pay fees due" under an alleged agreement, the claim is merely "derivative of [ESA's] breach of contract claims and barred by the Statute of Frauds." *Whitman*, 2015 WL 4467064, at *7 (granting motion to dismiss unjust enrichment and derivative 93A claim by marketing agent seeking "broker or finder" fee for "introducing prospective investors" to firm). Specifically: the "gravamen" of ESA's 93A theory is that Freshfields has "deprived" ESA of a "fee" for "professional services," (SAC ¶¶ 1, 73)—the same "fee" for which ESA seeks damages "as a result of [] Freshfields's breach of contract."  (*Id.* ¶ 99.)  Like the deficient contract claims on which it rests, ESA's derivative 93A claim must thus be dismissed.  *Corp. Dev. Assocs. v. Staples, Inc.*, 2013 WL 597488, at *4-5 (Mass. Super. 2013).

### C.   ESA's 93A Claim Must Be Dismissed For Independent Reasons As Well

Even if it not barred by the Massachusetts Statute of Frauds, ESA's Chapter 93A claim

also fails, separately, because the SAC fails to plead at least two required elements.

---

[8] In applying a narrow exception to the Statute's mandate that "broker or finder" agreements be in writing, the standard utilized by the Appeals Court in *Spectrum* makes clear that ESA does ***not*** qualify for that exception, reserved for the rare "configuration of facts" that "greatly diminishes the risk of fraud" otherwise inherent in oral agreements for "broker or finder" services.  2014 WL 1758109, at *4.  In *Spectrum*—the lone case, to Freshfields's knowledge, where the exception has saved "broker or finder" claims from dismissal—the parties shared a decades-long course of dealing under a "written agreement," so fees claimed under an oral modification could "readily be determined" based on that written contract.  *Id.*  In "stark contrast," ESA's claims are on all fours with those in *Cantell*, where the recruiter, like ESA, sought a "one-time finder's fee" absent any "prior contract"—the very "factual configuration" that the *Spectrum* court singled out as arising in the Statute's "heartland."  *Id.*  To hold otherwise here would be an unprecedented and unwarranted extension of an exception reserved for cases that stand in "stark contrast" to this one.  *Id.*

*First*, ESA's 93A claim is merely a repackaged set of contract-based allegations that plead nothing close to the type of "unfair or deceptive" conduct required to state a claim. Chapter 93A prohibits "unfair or deceptive" acts or practices. M.G.L. c. 93A, § 2. While the question of "unfairness" is a factual inquiry, "what may qualify for consideration as a [] violation is a question of law." *Whitman*, 2015 WL 4467064, at *8. And Massachusetts law is clear that "even intentional breach [of contract] is insufficient," and that a 93A claim must be dismissed where "well-pled facts suggest nothing more than a mere breach of contract," even if "knowing or intentional." *Id.* at *9 (granting motion to dismiss 93A claim that also failed on Statute of Frauds grounds). A plaintiff must thus allege conduct that is "not only wrong, but also egregiously wrong," *GMO ex rel. GMO Emerging Country Debt Fund v. ICAP*, 2012 WL 5197545, at *10 (D. Mass. 2012), vesting the breach with "an extortionate quality that gives it the rancid flavor of unfairness." *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992). In "cases where courts have found 93A violations arising out of a breach of contract," defendants have "wrestled" "additional services" from "the aggrieved party through false promises," *Whitman*, 2015 WL 4467064, at *9, or "repeatedly promised to pay" a plaintiff's fee, "stringing out the process" to "extract a favorable settlement." *Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47, 52, 55 (1st Cir. 1998).

Here, ESA does not plead anything close to the "egregiously wrong" or "extortionate" conduct needed to state a viable Chapter 93A claim. In fact, ESA explicitly pleads the opposite. As the SAC concedes, Freshfields did not "wrestle" any "additional services" from ESA—rather, the very day Freshfields found out about ESA's undirected cold call, it told ESA to stop, (SAC ¶ 52), and ESA did nothing else. Nor did Freshfields "string out the process" by "repeatedly promising" to accede to ESA's baseless demand. *Arthur D. Little*, 147 F.3d at 57. Again, the SAC alleges the opposite. Freshfields told ESA it would not pay a fee to which Freshfields never agreed

13

and to which ESA was not entitled, having had "no role in [the] introduction." (SAC ¶ 64.) ESA thus resorts to making "conclusory statements" "devoid of further factual enhancement." *Whitman*, 2015 WL 4467064, at *9; *cf.* SAC ¶ 73 (alleging that Freshfields told ESA "to discontinue any further [recruiting] efforts" "solely to unfairly deprive" ESA of its fee, but pleading no facts to support the assertion that this directive was given to "unfairly deprive" ESA of anything); *id.* ¶ 75 (alleging that Freshfields's "conduct in violation of [] 93A" was "intentional and willful," but pleading no facts to support any such intent). ESA's "threadbare recital" of Chapter 93A's elements—unsupported by any facts to support them—cannot stand. *Iqbal*, 556 U.S. at 678.[9]

**Second**, ESA's 93A claim should be dismissed because the SAC fails to allege another required statutory element: that the purportedly "unfair or deceptive" conduct occurred "primarily and substantially" in the Commonwealth. That element, "unquestionably a matter of law" for "purposes of Chapter 93A jurisdiction," requires that "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.,* 2014 WL 304070, at *4-5 (D. Mass. 2014) (granting motion to dismiss 93A claim). The SAC alleges the opposite.[10] ESA drove that point home in its now-moot Opposition to Freshfields's original Motion to Dismiss: in its two-page Introduction alone, ESA six times invoked—and italicized—the words "New York" to describe the place of conduct underlying its claims (while invoking the word "Massachusetts" to argue only that the Commonwealth's law does ***not*** apply). (ECF No. 26, at 1-2; *id*. at 2 ("whether the parties have an enforceable agreement will be determined under ***New York law***") (emphasis in original).)

---

[9] *E.g.*, *Husk, LLC v. Coca-Cola Refreshments*, 2013 WL 55815 (D. Mass. 2013) (granting motion to dismiss where "well-pleaded facts" did not "suggest anything more than a breach of contract.").

[10] *E.g.*, SAC ¶¶ 22-24, 28, 30, 33, 36, 54 (each referencing events or transactions in "New York").

The SAC itself claims, ultimately, that the center of gravity giving rise to ESA's meritless allegations is primarily and substantially in New York, not Massachusetts.  *Evergreen Partnering Grp.*, 2014 WL 304070, at *4.  ESA's Chapter 93A claim must thus be dismissed.

## III.    ESA'S CLAIMS MUST BE DISMISSED UNDER NEW YORK LAW

### A.    ESA's Contractual Claims Must Be Dismissed (Counts 4, 5)

ESA fails to plead anything resembling "the existence of a contract" in any form—because there was no such thing here—as required to state a claim for breach of contract or breach of the implied covenant under New York law.  *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011); *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312-13 (S.D.N.Y. 2014).  To survive dismissal on either claim, a plaintiff must allege, in "nonconclusory language," the "essential terms of the [] purported contract," *id*., and a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to *all* material terms." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 320 (S.D.N.Y. 2012) (granting motion to dismiss); *Prince of Peace Enters.*, *v. Top Quality Food Mkt.*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011) (granting motion to dismiss breach of contract claim for failure to plead mutual assent: "if there is no meeting of the minds on *all essential terms*, there is no contract.") (emphasis added).

Here, the SAC itself alleges that the parties never "manifest[ed] [] mutual assent" to *any* "material term," much less "all" of them, as required to state a breach of contract or breach of the implied covenant claim.  *Id.*  Instead, ESA bases its entire contractual claim on a falsehood belied by its own SAC: that Mr. Presser stated in an August 23, 2018 email that Freshfields "would agree" to ESA's Offer.  (SAC ¶ 34.)  To start, Mr. Presser's email says no such thing, and that "trump[s] the complaint's allegations." *Schatz*, 669 F.3d at 55 n.3.  What Mr. Presser actually wrote in the

email cited in the SAC was that Freshfields would (i) "***work with***" ESA's form,[11] (ii) ***if*** Freshfields did not have a "standard one," which—as ESA knows—Freshfields did.  (Ex. A.)

More fundamentally, the SAC's remaining 103 paragraphs establish that the parties never reached any "mutual understanding" on anything.  *Prince of Peace*, 760 F. Supp. 2d at 397.  After pleading that Freshfields "agreed" to ESA's Offer, (SAC ¶ 35), ESA alleges, twice, that it has "no present knowledge" whether Freshfields executed that contract (Freshfields did not).  (*Id.* ¶¶ 38, 58.)  Nor does ESA allege that that the parties entered any oral contract (they did not).  Instead, ESA alleges a proposed contract that was ***rejected***, as the parties commenced a battle of conflicting forms: on September 19, 2018, ESA sent its Offer to Freshfields (*id.* ¶ 36); on November 26, 2018, Freshfields rejected that Offer and replied with the Counteroffer that set forth what Freshfields would agree to and demand from ESA.  (*Id.* ¶ 54.)  The parties' proposals differ on every essential term—*e.g.*, the amount of any fee, the conditions under which it would be owed, and the duration of any contract—and ESA never agreed to or abided by the terms that Freshfields proposed:

- ESA's Offer applies to attorney groups (Savage Decl., Ex. B, at § 1.3), whereas Freshfields's Counteroffer rejects that approach (*id.* Ex. C ¶ 1 n.2) (yet ESA seeks payment for a four-person attorney group, three of whom ESA does not even allege to have communicated) (SAC ¶ 81).)[12]

- ESA's Offer does not require that a candidate grant written consent to make an introduction (Savage Decl., Ex. B), whereas Freshfields's Counteroffer requires, consistent with the NALSC Code of Ethics, that a recruiter present an Authorization Notice attesting that a candidate has granted written consent to an introduction (*id.* Ex. C ¶ 2) (here, ESA does not plead that it had such written consent (it did not), or that it presented an Authorization Notice to Freshfields (it did not).)

- ESA's Offer purports to entitle ESA to a fee for any lateral partner hired within a year of an introduction (Savage Decl., Ex. B § 1.2), whereas Freshfields's Counteroffer rejects that and provides that "no fee will be due" if a partner is hired more than six months after the recruiter presents an Authorization Notice to Freshfields (*id.* Ex. C ¶ 4) (here, the partner hiring at issue did not occur until eleven-plus months after ESA's lone cold call, ESA never provided any Authorization Notice to Freshfields, and ESA does not plead it ever ***made*** any introduction).

---

[11] *See* Cambridge Dictionary (2020) ("work" defined to include, *e.g.*, "to spend time and effort doing something"; "to try hard to achieve or improve something"; "to change the shape of a material to make something else with it").

[12] ESA's Offer also imposes no fee cap, (Savage Decl., Ex. B), whereas Freshfields's Counteroffer caps fees at $600,000 per partner (Savage Decl., Ex. C ¶ 3) (yet ESA demands millions by way of this lawsuit, SAC ¶ 81).)

ESA concedes that the parties' battle of the forms ended in ***disagreement***.  (SAC ¶ 55-56.)
The SAC alleges that, on November 27, 2018, upon receiving Freshfields's Counteroffer, ESA did
not agree.  (*Id*.)  Instead, ESA's Mr. Morimoto responded by re-forwarding ESA's Offer, writing
in his email that Freshfields should contact ESA's CEO and COO to "discuss terms and
conditions" and "not[ing] that [Freshfields's proposed] fee cap is significantly lower than
expected" and lower than other firms' caps.  (SAC ¶ 56; Savage Decl., Ex. B.)  On November 29,
2018, the SAC alleges, Freshfields replied that it would take ESA's Offer to Freshfields's COO.
(SAC ¶ 57.)   The parties' back-and-forth thus ended with ESA ***rejecting*** Freshfields's
Counteroffer, without "mutual assent" to "all material terms," as required to state a claim for
breach of contract or breach of the implied covenant under New York law.  *Cohen*, 874 F. Supp.
2d at 320.  Instead, the SAC alleges, there was no "meeting of the minds" on ***any***—much less
"all"—"essential terms," meaning "there is no contract" here.  *Prince of Peace*, 760 F. Supp. 2d
at 397.[13]  Counts 4 and 5 should be dismissed.

### B.      ESA's Quasi-Contractual Claims Must Be Dismissed (Counts 2, 3)

ESA's claims for quantum meruit and unjust enrichment fail for similar reasons.
"[A]nalyze[d] together as a single quasi-contract claim" under New York law, *Mid-Hudson
Catskill Rural Migrant Ministry v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005), a plaintiff
must establish: "(1) the performance of services in good faith, (2) the acceptance of the services
by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the
reasonable value of the services."  *Vioni v. Am. Cap. Strategies*, 508 F. App'x 1 (2d Cir. 2013).
"***Both*** parties must understand that the party performing the services has a reasonable expectation

---

[13] The SAC makes it clear what was in Freshfields's mind: all the terms of its standard recruiter contract, *i.e.*,
Freshfields's Counteroffer.  ESA did not agree to that proposal, and Freshfields never agreed to anything else.

of compensation for those services." *Id.* An unjust enrichment, moreover, can survive only where relief is required as a matter of "equity and good conscience." *Dragon Inv. Co. II v. Shanahan*, 854 N.Y.S.2d 115, 118 (2008) (granting motion to dismiss, as a "claim for unjust enrichment" does not relieve a plaintiff's failure to "exercise caution with respect to a business transaction'").

ESA fails to adequately plead its claims. First, the SAC alleges no facts to support the assertion that Freshfields "accepted" ESA's services as to Mr. Klingsberg. *Mid-Hudson*, 418 F.3d at 175. Instead, ESA pleads that Freshfields *rejected* ESA's so-called "services," which amount to one cold call, made without Freshfields's instruction, almost a year before he was hired. The SAC alleges that, within hours of learning of this undirected outreach, Freshfields told ESA to halt any further recruiting efforts. (SAC ¶ 52.) Given this, ESA attempts to redefine its so-called "services" to broadly include efforts to "identify and recruit prospective lateral partners." (*Id.* ¶ 59.) But, as to Mr. Klingsberg, the SAC makes clear that Freshfields did not direct ESA to provide its purported "service" (*i.e.*, single cold call), nor did Freshfields "accept" any such service. *Vioni*, 508 F. App'x at 1. Instead, the SAC alleges, Freshfields immediately told ESA to stop.

Nor, relatedly, does ESA plead any facts to support its conclusory assertion that Freshfields had a "reasonable expectation" of paying ESA the fee it demands for its one unsolicited outreach. (SAC ¶ 79.) The SAC compels the opposite conclusion. ESA does not allege it did anything beyond making this lone call and making an indiscriminate pitch to Freshfields (it did not). (*Id.* ¶¶ 45-49.) And, even if that call somehow constituted an "introduction," it *still* would not have warranted payment under Freshfields's Counteroffer, the contract that embodies Freshfields's "reasonable expectations" for compensating recruiting firms. (Savage Decl., Ex. C.) Freshfields's Counteroffer states that Freshfields "shall not pay any placement fees" unless a recruiter possessed the candidate's "written consent" to an introduction, *and* the candidate was hired within six months

of the recruiter presenting Freshfields with an Authorization Notice reflecting that "written consent." (Ex. C ¶ 4.) ESA does not plead that Mr. Klingsberg provided such "written consent" to ESA (he did not), nor that ESA provided any "Authorization Notice" to Freshfields (it did not).[14] And Freshfields did not even hire him until nearly an entire year after ESA's lone outreach— almost six months later than any "service" for which Freshfields would ever reasonably expect to pay any recruiter anything in accordance with the terms of its own proposed contract.

ESA's claim that Freshfields expected to pay millions for this alleged "service"—and millions more for the three lawyers who came to Freshfields without any knowledge or involvement by ESA—is thus belied by "a document that expressly indicate[s] the contrary." *Koch v. Multiplan, Inc.*, 2001 WL 210004, at *5 (S.D.N.Y. 2001) (dismissing quantum meruit claim where there was "not even a writing signed by [defendant] indicating" that services were "comprehended within the parties' arrangement"; "only a document that expressly indicated the contrary"). "Equity and good conscience" thus do not warrant the multi-million payday that sophisticated plaintiff ESA demands for a cold call it made almost a year before Mr. Klingsberg's hiring, without Freshfields's direction and without any contractual agreement—nor the millions ESA demands in relation to his three colleagues, with whom ESA never once communicated. *Shanahan*, 854 N.Y.S.2d at 118. This is especially true where, as here, Freshfields has in no way been enriched at ESA's expense, as Freshfields paid a different recruiter for the introduction. *Id*.

C.     **ESA's Chapter 93A Claim Must *Per Se* Be Dismissed (Count 1)**

As under Massachusetts law, ESA's 93A claim must be dismissed because ESA does not— and cannot—allege at least two of the Statute's required elements. (*See supra* at 13-15.) But this

---

[14] ESA also fails to plead that it performed any services "in good faith." *Viani*, 508 F. App'x at 1. ESA alleges that it cold-called and "introduced" Mr. Klingsberg to Freshfields, (SAC ¶ 45-49, 85)—yet ESA does **not** allege that it had his consent to such introduction, in violation of both Freshfields's Counteroffer (Ex. C ¶ 6) and the incorporated NALSC Code of Ethics, which prohibits referrals without candidates' "express consent." (Savage Decl. ¶ 6, Ex. D.)

Count's failure under New York law is more fundamental: if New York law governs ESA's contract-based claims (as ESA now insists), then its 93A claim is barred, *per se*, as a matter of law.

It is "well settled" that where "the law of another jurisdiction appli[es] to [an] agreement between the parties," any allegations under 93A are barred "if they amount, in substance," to "embroidered breach of contract claims." *BNY Fin. Corp. v. Fitwel Dress Co., Inc.*, 6 Mass. L. Rptr. 373, at *4 (Mass. Super. 1997) (dismissing 93A claim premised on same conduct as contract claims governed by New York law); *Bradley v. Dean Witter Realty, Inc.*, 967 F. Supp. 19, 28 (D. Mass. 1997) ("critical factor" in determining 93A's applicability is whether claim is "intertwined with," and not "qualitatively distinct from," contract purportedly "governed by another state's law"). That is just the case here: as detailed *supra* (at 13-14), ESA's 93A claim amounts to an "embroidered breach of contract claim," *BNY Fin. Corp.*, 6 Mass. L. Rptr., at *4, to which ESA urges this Court to apply New York law. "It is inconsistent and illogical for [ESA] to now contend that Massachusetts statutory law should also be chosen to apply" to the "same acts or omissions" underlying those contract claims "in light of [ESA's] position that New York law applies" to them. *Cornwell Entm't, Inc. v. Anchin, Block & Anchin LLP*, 2013 WL 2367849, at *1 (D. Mass. 2013). Ultimately, ESA "cannot sensibly contend that Massachusetts law also applies" to the same conduct for which it seeks relief under the law of New York "simply because [93A] offers distinctive remedies." *Id*. To the extent that New York law governs the SAC's contract-based allegations—which should all be dismissed—ESA's 93A claim must thus be dismissed as well.[15]

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed in its entirety, with prejudice.

---

[15] ESA should not be granted leave to amend its complaint for a third time, because "amendment would be futile": there exist no "additional facts which, if re-pled," would permit ESA "to cross the plausibility threshold" and state any viable claim. *HSBC Realty Credit Corp. v. O'Neill*, 745 F.3d 564, 578 (1st Cir. 2014); *see Costa v. Mass. P'ship for Corr. Healthcare*, 2018 WL 3769823, at *2 n.2 (D. Mass. 2018) (granting dismissal with prejudice).

Dated:  March 23, 2020

Respectfully submitted,

FRESHFIELDS BRUCKHAUS DERINGER US LLP,

By its attorneys,

*/s/ Joseph F. Savage, Jr.*
Joseph F. Savage, Jr. (BBO # 443030)
Courtney D. Orazio (BBO # 692385)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
T:  617.570.1000
F:  617.523.1231
JSavage@goodwinlaw.com
COrazio@goodwinlaw.com

Timothy P. Harkness (*pro hac vice*)
Brayden Koslowsky (*pro hac vice forthcoming*)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue
New York, New York 10022
T: 212.230.4610
timothy.harkness@freshfields.com
brayden.koslowsky@freshfields.com

## CERTIFICATE OF SERVICE

I, Joseph F. Savage, Jr., hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on March 23, 2020.

*/s/ Joseph F. Savage, Jr.*

21